UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RICHARD J. DUPONTE, II,
    Plaintiff,

v.

ASHBEL T. WALL, MATTHEW
KETTLE, JEFFREY ACETO, BRUCE
ODEN, JACK WARD, FREDD SPECHT,
TERESA BERUBE, JOSEPH DINITTO,
and WILLIAM BEGONES, in their
individual and official capacities, and the
RHODE ISLAND DEPARTMENT OF
CORRECTIONS,
    Defendants.

C.A. No. 17-397-JJM-LDA

# MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

Richard J. DuPonte, II, an inmate in the custody of the Rhode Island Department of Corrections ("RIDOC"), has brought a complaint against RIDOC and various employees alleging violations of his civil rights. Specifically, he argues that his placement of one year in disciplinary segregation violates both his rights under the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment's prohibition on cruel and unusual punishment. The Defendants have moved to dismiss (ECF No. 14), which Mr. DuPonte opposes (ECF No. 17). For the following reasons, the motion to dismiss is GRANTED IN PART and DENIED IN PART.

## I.   BACKGROUND

The Court recites the plausible facts as alleged by Mr. DuPonte pertaining to the two incidents that give rise to his Complaint.

### A. The June 12 Incident

On June 12, 2017, Mr. DuPonte and another inmate, S. Romano, engaged in a physical altercation in the kitchen. The incident was categorized as "Fighting (inmate on inmate) that did not involve serious injury." Mr. DuPonte alleges that he and Mr. Romano were "horsing around" and that Mr. Romano fell. After a hearing, Mr. DuPonte was found guilty of the infraction. He was sentenced to twenty days' loss of good time and twenty days of disciplinary segregation.

Subsequent to the hearing, Defendant and then-Deputy Warden Jeffrey Aceto recommended that Mr. DuPonte's status be downgraded—i.e., that he be reclassified at a more restrictive setting—for both his role in the incident and because of his history of violent conflict with other inmates. Prison records submitted by Mr. DuPonte with his Complaint state that his "last four bookings [were] for violence with inmates and assault on staff." Mr. DuPonte countered that, prior to this incident, he had not been subject to discipline for two years, had been active in rehabilitative, vocational, and educational program, was employed in the prison kitchen, and was due for good time release in six months (i.e., in December of 2017).

At the classification hearing for this incident, Defendant Jack Ward, the classification panel chairperson, downgraded Mr. DuPonte to high security "C" status.[1] Mr. DuPonte was not provided a counselor before, during, or after this

---

[1] Additionally, Defendants Teresa Berube and Joseph DiNitto may have been involved with the classification hearing or disciplinary hearing (or both). *See* ECF No. 1 at 17.

2

hearing. As justification for the downgrade, Mr. Ward told Mr. DuPonte that it was because of "a stabbing over at Max" earlier that day, July 12.

B. The July 12 Incident

On the morning of July 12, Mr. Romano was attacked by several other inmates. The attack was categorized as "Assault with a Weapon on an Inmate with serious injury resulting," and the severity level was "Highest (Predatory)." At the time, Mr. DuPonte was standing at a phone bank some thirty to fifty yards away.

The infraction was recorded against Mr. DuPonte by Defendant Inspector William "Billy" Begones two days later. According to the report, Mr. DuPonte "had knowledge of inmate Romano being assaulted by first meeting with these inmates prior to going into the yard and inmate DuPonte stating I don't what [sic] anything happening—then during the interview were [sic] also stated that 'he knew inmate Romano was going to be assaulted but it was only going to be a beaten [sic].'" The report also charged Mr. DuPonte with "standing at a phone bank pretending to be on the phone." The report states that "the phone was checked and no call was made by inmate DuPonte from that particular phone at that time."

Lt. William Galligan, the supervising officer, read the booking to Mr. DuPonte. Mr. DuPonte denied making the above statement to the investigator and stated that he was, in fact, on the phone. He challenged being charged with assault with a weapon when he was not present for the incident. He also asked how any coordination could have occurred when he had just left disciplinary confinement. Mr. DuPonte said he was innocent and requested counselor representation at his disciplinary hearing. He made attempts that evening to secure the presence of either

3

Defendant Counselor Teresa Berube or Defendant Counselor Fredd Specht at his hearing; he also asked them to collect records of his phone usage on the date of the incident, housing assignments for all inmates involved, and video of the incident with timestamps.

Defendant Lt. Bruce Oden conducted Mr. DuPonte's disciplinary hearing. Lt. Oden was the sole adjudicative officer present for the hearing. Mr. DuPonte again requested a counselor representative. Lt. Oden attempted to contact Counselor Berube, but she was unavailable. Lt. Oden then said he would have to call Counselor Specht, but that it "would take all day." Lt. Oden asked Mr. DuPonte what he needed a counselor for; Mr. DuPonte responded that it was to provide his pre-requested evidence. Lt. Oden told Mr. DuPonte that the counselors were not his attorneys, and Mr. DuPonte was not allowed to present his evidence. No counselor attended the hearing or met with Mr. DuPonte before or after the proceeding. Mr. DuPonte was found guilty "based on invest. report and evidence obtained through investigation."

Lt. Oden sentenced Mr. DuPonte to 365 days of segregation. Mr. DuPonte asked Lt. Oden how he could justify such a sentence when he had nothing to do with the incident; Lt. Oden replied that he was told to give a year to everyone involved in the July 12 incident. Lt. Oden then refused to give Mr. DuPonte a copy of the results of the hearing. Mr. DuPonte made several inquiries of Lt. Oden and Counselor Berube for the results, but they went unanswered; it is unclear if or when he received a copy. However, he does appear to have taken an appeal.

4

On August 1, Mr. DuPonte received now-Warden Aceto's denial of his appeal. The appeal also appears to have been denied by Defendant Deputy Director Matthew Kettle. Mr. DuPonte spoke with Warden Aceto that morning, and directly questioned the sufficiency of the evidence against him; Warden Aceto declined to discuss it. Nevertheless, on August 11, Mr. DuPonte received a memo from Warden Aceto stating that a phone log was a government record—presumably referring to the log Mr. DuPonte claimed would prove he was actually using the phone on the day of the incident, and thus, was not involved—and that Warden Aceto could not access the record or authorize its release, even though the phone log was apparently used as evidence against Mr. DuPonte.

On August 16, Mr. DuPonte was again brought before a classification board chaired by Mr. Ward. Mr. DuPonte twice asked for the hearing to be recorded; Mr. Ward twice denied his requests. Mr. DuPonte was again not provided with a counselor. He told the board he received no notice of the hearing and had no chance to prepare for it. Mr. DuPonte also asked that Mr. Ward not chair the hearing, as he had filed a grievance against Mr. Ward for his handling of the July 12 hearing. Mr. DuPonte argued that his downgrade was based on what he believed to be false evidence; the hearing officer told Mr. DuPonte that all he "cared about was [that Mr. DuPonte] was found guilty" and that he could submit another grievance.

While in disciplinary confinement for one year, Mr. DuPonte has been and will be subjected to "the RIDOC version of housing that most closely resembles the general definition of solitary confinement." State of Rhode Island, Report of the Special

5

Legislative Commission to Study and Assess the Use of Solitary Confinement at the Rhode Island ACI (the "Report") 5 (2017), http://www.rilin.state.ri.us/Reports/Solitary%20final%20report.pdf. As a prisoner at the maximum security facility, Mr. DuPonte is in a single cell for twenty-three hours per day, and is allowed one hour of exercise per day. *Id.* His status is reviewed every ninety days, he has the ability to request a review from the warden, and can have immediate review if staff or mental health professionals advise the warden that confinement is harmful to his mental health. *Id.* at 6. Mr. DuPonte specifically alleges he is deprived the same privileges as those inmates in the general population and in administrative segregation: Visits, phone calls, radios access, television access, newspaper access, programming, a mirror, a desk, plastic bins for clothing and legal material, and weather-appropriate footwear. Mr. DuPonte claims that he has lost educational opportunities, including enrollment at C.C.R.I. and a federal Pell Grant; that he suffers emotional distress; that his anxiety, sleep problems, and sciatica have grown worse; and that his mental health is deteriorating.

## II. STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff's claim is plausible when it states sufficient facts that allow "the court to draw the reasonable inference that the defendant is liable." *Id.*

6

"The Court must accept a plaintiff's allegations as true and construe them in the light most favorable to the plaintiff, and review pleadings of a *pro se* plaintiff liberally. However, the Court need not credit bald assertions or unverifiable conclusions." *Tucker v. Wall*, No. 07-406 ML, 2010 WL 322155, at *8 (D.R.I. Jan. 27, 2010) (citations omitted). At the motion to dismiss stage, a court must "consider not only the complaint but also matters fairly incorporated within it and matters susceptible to judicial notice." *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003).

## III. DISCUSSION

The Defendants argue Mr. DuPonte states neither a Fourteenth nor an Eighth Amendment claim.[2] The Defendants also contest the forms of relief that Mr. DuPonte may seek from them. The Court addresses each in turn.

### A. Claims under the Fourteenth Amendment

Mr. DuPonte alleges that his disciplinary and classification proceedings—and the resulting year-long sentence of disciplinary confinement—violated his Fourteenth Amendment rights. The Court must first address whether Mr. DuPonte's claims implicate a liberty interest. Finding that they do, the Court then turns to the sufficiency of the process Mr. DuPonte alleges he was provided.

---

[2] The Defendants also read Mr. DuPonte's Complaint as advancing claims under the *Morris* rules. *See* ECF No. 14 at 9. However, Mr. DuPonte disavows that he is relying on such a theory. *See* ECF No. 17 at 15. Accordingly, the Court need not address this issue.

Mr. DuPonte also states at various points in his Complaint that he is asserting claims under the Sixth Amendment. *See* ECF No. 1 at 3, 11. The Court believes those allegations attempt to state a Fourteenth Amendment claim, however, and accordingly the Court treats those allegations under that framework.

7

1. Liberty Interest

Prisoners held in segregation may have liberty interests protected by the Due Process Clause of the Fourteenth Amendment. The touchstone for evaluating such a claim is found in *Sandin v. Conner*, 515 U.S. 472 (1995). In that case, the Supreme Court held that discipline in segregated confinement may trigger due process considerations when it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. The Court held that a prisoner's thirty-day disciplinary segregation did not "present a dramatic departure from the basic conditions of [his] indeterminate sentence." *Id.* at 485. The Court noted that the prisoner's "disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates" in non-disciplinary settings such as administrative segregation and protective custody. *Id.* at 486; *see also id.* at 476 n.2 (explaining that administrative segregation provides one additional phone call and one additional visiting privilege than disciplinary segregation).

Ten years later, the Supreme Court decided *Wilkinson v. Austin*, 545 U.S. 209 (2005). In *Wilkinson*, the Court concluded that inmates had a liberty interest in avoiding assignment to the Ohio State Penitentiary (OSP), the state's supermax prison. *Id.* at 213, 224. At OSP, inmates faced conditions of solitary confinement: They had almost no human contact, lights were on twenty-four hours per day, and inmates were given one hour of exercise per day in a small room. *Id.* at 223–24. Additionally, the Court found that placement at OSP was "indefinite," and there was limited opportunity for review of the placement. *Id.* at 224. The Court also found that placement at OSP disqualified an inmate otherwise eligible for parole

8

consideration. *Id.* The Court held that, taken together, these conditions "impose[d] an atypical and significant hardship within the correctional context," and that the plaintiff inmates had a liberty interest. *Id.*

Courts have recognized that extreme length of disciplinary confinement can be a significant factor in implicating liberty interest. *See Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697–99 & nn. 3–4 (7th Cir. 2009) (reversing dismissal and holding segregated confinement for 240 days potentially states claim to liberty interest); *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (segregation for 305 days "a sufficient departure from the ordinary incidents of prison life" to implicate liberty interest); *see also Magluta v. Samples*, 375 F.3d 1269, 1282 (11th Cir. 2004) (solitary confinement in small space with minimal contact with others for over 500 days satisfies *Sandin* standard). Allegations that are insufficient to violate a liberty interest on their own may do so when "taken in the aggregate, at the pleading stage." *Cook v. Wall*, No. 09-169 S, 2013 WL 773444, at *1 (D.R.I. Feb. 28, 2013); *see also Wilkinson*, 545 U.S. at 224 (holding that, while certain "conditions standing alone might not be sufficient to create a liberty interest, taken together they [can] impose an atypical and significant hardship within the correctional context").

Mr. DuPonte has been sentenced to a year of disciplinary segregation, where he is subjected to near solitary confinement. He alleges that he is denied visiting privileges and phone calling privileges. He is not permitted access to a radio, television, or newspaper. He is denied vocational, rehabilitative, and educational programming. He does not have a mirror, and has limited opportunities for personal

9

hygiene. He does not have a desk to write at, nor his storage for clothing and legal material. He is not provided with weather-appropriate footwear. He is deprived of sleep because he is woken every half hour by a bang at door and the bright "count light." He has limited access to reading and legal material. Mr. DuPonte alleges that these conditions do not "mirror" the conditions found in non-disciplinary settings such as administrative segregation and that of the general population.

Taken together, and drawing reasonable inferences in Mr. DuPonte's favor, he plausibly claims a liberty interest in avoiding the conditions of confinement and the length of time he will be subjected to them. By any measure, the year of solitary confinement Mr. DuPonte faces presents an atypical and significant hardship in relation to the ordinary incidents of prison life. *See Wilkinson*, 545 U.S. at 223–24. The Court concludes that, at the pleading stage, Mr. DuPonte's segregation implicates a protected liberty interest.[3]

---

[3] Mr. DuPonte also alleges that he has a liberty interest in avoiding revocation of his good time credit under R.I. Gen. Laws § 42-56-24. The award of good time credit in Rhode Island is discretionary, however, and so no liberty interest attaches. *See Leach v. Vose*, 689 A.2d 393, 398 (R.I. 1997) ("there is no liberty interest created by our good time and industrial time credit statute since it is completely discretionary"); *Barber v. Vose*, 682 A.2d 908, 914 (R.I. 1996) ("so-called good time credit for good behavior while incarcerated is not a constitutional guarantee, but is instead an act of grace created by state legislation" (citing *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974))); *see also Morgan v. Dretke*, 433 F.3d 455, 457 n.2 (5th Cir. 2005) ("[I]t is the protected liberty interest in good time credits that implicates due process concerns and . . . state law determines whether good time credits constitute a protected liberty interest in a given state."). While these decisions refer to an earlier version of the statute, the relevant provision remains discretionary. *See* R.I. Gen. Laws § 42-56-24 (requiring consent of the director upon recommendation of the assistant director for bestowal of credit).

The Defendants cite to two decisions by other judges in this district that have held shorter periods of disciplinary confinement do not implicate a liberty interest. *See Goddard v. Oden*, No. 15-055 ML, 2015 WL 1424363, at *3 (D.R.I. Mar. 27, 2015) (bare allegation of disciplinary segregation for "an extra (30) days or more" is insufficient); *Williams v. Wall*, No. 06-012 S, 2006 WL 2854296, at *3 (D.R.I. Oct. 4, 2006) (twenty-one days of segregation not atypical and significant). Mr. DuPonte's allegations in this case, however, are far different—he is challenging disciplinary confinement lengthier by an order of magnitude.

Mr. DuPonte's allegations also distinguish his case from another decision from this district cited by Defendants, *Benbow v. Weeden*, No. 13-334 ML, 2013 WL 4008698 (D.R.I. Aug. 5, 2013). In *Benbow*, the district judge adopted a report and recommendation that held that "Benbow must plead more than placement in disciplinary segregation for a year" to implicate a liberty interest. *Id.* at *3. That decision seems to suggest that a bare allegation of disciplinary confinement—without any allegations concerning conditions of confinement or what process was afforded—cannot state a claim to a liberty interest. *See id.* (citing *Colon*, 215 F.3d at 231, a Second Circuit decision which held 305 days of segregation in solitary confinement *does* state a claim). The court also determined that Mr. Benbow waived "any due process rights that might have existed" by voluntarily failing to appear at his disciplinary hearing. *Id.* at *4. This contrasts sharply with Mr. DuPonte's case, in which he made specific allegations concerning his conditions of confinement, denied

11

the charges against him, attempted to fully participate in the hearing, and made efforts to collect and introduce evidence.

2. Process Due

Having determined that Mr. DuPonte plausibly states a claim to a liberty interest, the Court must now turn to the question of what process he is due. *Wilkinson*, 545 U.S. at 224. "Because the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands,'" the Court uses a three-factor framework to test the adequacy of particular procedures. *Id.* (alteration in original) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The three factors the Court must consider are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The first factor undoubtedly cuts in Mr. DuPonte's favor, as he has an interest in avoiding erroneously being confined to disciplinary segregation for one year. This is a valid interest even "within the context of the prison system and its attendant curtailment of liberties." *Wilkinson*, 545 U.S. at 225. While Mr. DuPonte's incarceration undoubtedly restrains his liberties in and of itself, he alleges disciplinary segregation works a significantly greater loss than if he were to remain in the general prison population. This liberty interest is not "minimal." *Id.*

The second factor the Court must weigh is the risk of erroneous disciplinary confinement under the procedures in place, and the probable value of any additional procedures. Notice of the factual basis for the placement and a fair opportunity for rebuttal are "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Id.* at 225–26. However, "more formal, adversary-type procedures" can be warranted in certain disciplinary contexts. *Id.* at 228 (citing *Wolff v. McDonnell*, 418 U.S. 539, 539 (1974)). These procedures can include written notice of the violation, at least twenty-four hours' notice to prepare a defense, a written statement by the factfinders explaining their decision, and the opportunity to call witnesses and present evidence. *Wolff*, 418 U.S. at 564–66.

At the pleading stage, this second factor also appears to weigh in favor of Mr. DuPonte. Mr. DuPonte alleges numerous procedural deficiencies. For example, he alleges that during his classification hearing related to the June 12 incident, he was in fact downgraded for his role in a separate incident the morning of the hearing; if this is true, he would not have received adequate notice and an opportunity to prepare a defense. Mr. DuPonte also claims he did not receive notice of his August 16 hearing. He further alleges that he went to great lengths to procure a written explanation of the decision sentencing him to 365 days' confinement, and that he was repeatedly denied this document. He also alleges that he was unable to present exculpatory evidence. Taken together at the pleading stage, these allegations suggest a significant risk of erroneous segregation through the procedures used, and that

additional safeguards likely would have been valuable in preventing a deprivation of Mr. DuPonte's liberty.

The third factor—the State's interest—cuts strongly in favor of the Defendants. "In the context of prison management . . . this interest is a dominant consideration." *Wilkinson*, 545 U.S. at 227. "The State's first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Id.* Mr. DuPonte was sentenced to disciplinary segregation for his alleged role in assaulting another inmate—a behavior characterized as "predatory." This certainly implicates an interest in the safety of prison personnel and other inmates. Although this factor weighs heavily in favor of Defendants, it is offset by two factors in favor of Mr. DuPonte. At this early stage of the litigation, the balance of the *Mathews* factors suggest Mr. DuPonte has plausibly alleged he was denied procedural due process.

Mr. DuPonte has not, however, stated his procedural due process claim against each Defendant he has named. Plausibly read, he fails to state any Fourteenth Amendment claim against Defendants Fredd Specht, Teresa Berube, Joseph DiNitto, or William Begones, most of whom the Complaint mentions only in passing. Mr. DuPonte has pled sufficient factual matter to state a claim against Defendants Ashbel T. Wall, Matthew Kettle, Jeffrey Aceto, Bruce Oden, Jack Ward, and RIDOC. Accordingly, the Defendants' motion to dismiss Mr. DuPonte's Fourteenth Amendment claims is GRANTED as to Defendants Specht, Berube, DiNitto, and Begones, and is otherwise DENIED.

B. Claims under the Eighth Amendment

Mr. DuPonte also alleges that his year of disciplinary confinement violates the Eighth Amendment's prohibition on cruel and unusual punishment. To state a claim under the Eighth Amendment, a prisoner must plausibly allege that he faces cruel and unusual conditions of confinement and that the prison officials were deliberately indifferent to those conditions. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).

"No static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'" *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). Deliberate indifference requires that "(1) the defendant knew of (2) a substantial risk (3) of serious harm and (4) disregarded that risk." *Calderon-Ortiz v. LaBoy-Alvarado*, 300 F.3d 60, 64 (1st Cir. 2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 835–40 (1994)).

The First Circuit has held that prison punishment otherwise permitted may violate the Eighth Amendment if "it is extremely disproportionate, arbitrary or unnecessary." *O'Brien v. Moriarty*, 489 F.2d 941, 944 (1st Cir. 1974). In *O'Brien*, the First Circuit rejected an Eighth Amendment claim where the prisoners received the same food as others; did not complain of heat, sanitation, lighting, or bedding; and were allowed out of their cells for an hour each day. *Id.* However, the court noted that, if imposed "for too long a period, even the permissible forms of solitary confinement might violate the Eighth Amendment," and that most cases upholding solitary confinement are where it is "a *short-term* punishment for disciplinary

infractions." *Id.* (emphasis added); *see also Hutto v. Finney*, 437 U.S. 678, 687 (1978) (unpleasant conditions of confinement "might be tolerable for a few days and intolerably cruel for weeks or months").

The Court concludes that, at this stage, Mr. DuPonte has plausibly alleged an Eighth Amendment violation. As discussed in the preceding sections, Mr. DuPonte has alleged conditions tantamount to solitary confinement. While these conditions may be permissible in short bouts under some circumstances, Mr. DuPonte has been made to endure them for a year. In recent years, society has become increasingly aware of the profound impact that solitary confinement can have on an individual's mental and physical health. It is plausible that a reasonable fact-finder could conclude that the conditions alleged by Mr. DuPonte—and the length of time for which he must face them—violate the "evolving standards of decency that mark the progress of a maturing society."

Furthermore, the allegations that Defendants acted with deliberate indifference are plausible. First, placement of prisoners in solitary confinement poses a substantial risk of serious harm. "[I]t is well documented that . . . prolonged solitary confinement produces numerous deleterious harms." *Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., dissenting); *see also id.* (citing authorities). The damage that prolonged solitary confinement can inflict upon the human mind has been long documented and acknowledged, both around the world and at home. *See id.* (noting the United Nations Special Rapporteur on Torture has called for a global ban on solitary confinement exceeding fifteen days); *see also Davis v. Ayala*, 135 S.

16

Ct. 2187, 2209–10 (2015) (Kennedy, J., concurring) (recounting the horror that solitary confinement instilled in prisoners in Britain even in the eighteenth century and citing authority to the present that shows "growing awareness" of the issue of solitary confinement in modern American penal systems).

Second, this knowledge can be plausibly charged to the Defendants. Locally, on June 29, 2017, the Rhode Island Special Legislative Commission to Study and Assess the Use of Solitary Confinement at the Rhode Island ACI (the "Commission") published its Report. Defendant Ashbel T. Wall, the director of the RIDOC, was a member of the Commission. Report at 2. The Report recognizes that solitary confinement "has recently been the focus of a world-wide human rights campaign," and cites criticism calling the practice "dehumanizing." *Id.* at 2–3. The Report likens Rhode Island's "disciplinary confinement" to solitary confinement. *Id.* at 5. The Commission heard testimony from subjects of solitary confinement, who testified to "the lasting negative impact of their isolation . . . on their mental and physical health." *Id.* at 8. The Commission also received testimony that "prolonged isolation causes higher rates of psychiatric hospitalization, sleeplessness, anxiety, depression and suicidal thoughts among prisoners." *Id.* The Report cites testimony regarding "the lack of any empirical evidence of the effectiveness of solitary confinement as a tool to deter recidivism or change a prisoner's behavior." *Id.* Among the recommendations of the Commission are "time limits," including "15 day maximum sentence for disciplinary confinement." *Id.* at 12–13. Mr. DuPonte was sentenced to

one year in disciplinary confinement on July 18, some three weeks after the Report was published.

Finally, there are sufficient allegations that the Defendants ignored the risk of harm to Mr. DuPonte. Even though the Report recommends limiting disciplinary confinement to a period not to exceed fifteen days, Mr. DuPonte was sentenced to one year. Moreover, he alleges that Lt. Oden was "told" to give Mr. DuPonte this lengthy sentence in solitary confinement, perhaps by one of his superiors (for example, Deputy Director Kettle or Warden Aceto). Mr. Ward allegedly told Mr. DuPonte that all he "cared about was [that Mr. DuPonte] was found guilty." These facts and allegations suffice for Mr. DuPonte to plausibly plead that Defendants Wall, Kettle, Aceto, Oden, Ward, and RIDOC acted with deliberate indifference.

The Defendants cite an adopted report and recommendation by a magistrate judge in this district for the proposition that "[d]isciplinary segregation, even for periods as long as twenty six months, does not constitute cruel and unusual punishment." *Harris v. Perry*, No. 15-222 ML, 2015 WL 4879042, at *5 (D.R.I. July 15, 2015). For this proposition, *Harris* cites a footnote in an adopted report and recommendation from the United States District Court for the District of Minnesota, which discusses Eighth Circuit law that lengthy disciplinary confinement does not establish an Eighth Amendment violation. *See id.* (citing *Green v. Hearing Officer on Report 452704*, No. 14-857 ADM/BRT, 2015 WL 2381590, at *2 n.7 (D. Minn. May 19, 2015)). The Defendants make no effort to explain how—or if—the conditions of segregation alleged by Mr. DuPonte compare to those in the Eighth Circuit cases.

18

This Court knows of no First Circuit precedent that establishes a permissible period of time for solitary confinement, where no shorter sentence could ever be considered cruel and unusual punishment.

Accordingly, the Defendants' motion to dismiss Mr. DuPonte's Eighth Amendment claims is GRANTED as to Defendants Specht, Berube, DiNitto, and Begones, and is otherwise DENIED.

C. Relief

The Defendants argue that Mr. DuPonte cannot pursue money damages against them, claiming that they are named in their official capacities as state actors, and so damages are unavailable under *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989). The Defendants are correct inasmuch as *Will* held that state defendants sued in their official capacities cannot be sued for money damages. *See id.* at 70–71.

However, the Defendants were not sued only in their official capacities; Mr. DuPonte, in fact, sued the named Defendants in both their official *and* individual capacities. *See* ECF No. 1 at 2–5. To the extent Mr. DuPonte seeks damages, then, those can be obtained from the remaining named Defendants in their individual capacities. *See Kentucky v. Graham*, 473 U.S. 159, 167–68 (1985). To the extent Mr. DuPonte seeks declaratory and injunctive relief, those remedies are available against the remaining named Defendants in their official capacities. *See Will*, 491

19

U.S. at 89–90 (Stevens, J., dissenting); *Quern v. Jordan*, 440 U.S. 332, 337 (1979) (citing *Ex parte Young*, 209 U.S. 123 (1908)).[4]

IV. CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss (ECF No. 14) is GRANTED as to Defendants Specht, Berube, DiNitto, and Begones; and DENIED as to Defendants Wall, Kettle, Aceto, Oden, Ward, and RIDOC.

IT IS SO ORDERED

/s/ John J. McConnell, Jr.

John J. McConnell, Jr.
United States District Judge

January 22, 2018

---

[4] Mr. DuPonte's Complaint also requests preliminary injunctive relief. *See* ECF No. 1 at 30. The Court declines to grant it, as Mr. DuPonte has not met his burden. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996). Furthermore, Mr. DuPonte's request for the appointment of counsel has previously been denied. *See* Text Order, Sept. 13, 2017.